22-1248 M. Welles and Associates v. Edwell. Good morning and may it please the court, Jonathan Hart on behalf of Appellant and Plaintiff M. Welles and Associates with me today is my partner Matthew Rozier and if it pleases the court I intend to reserve several minutes for rebuttal. I'd like to start with a few key points that are not in dispute here. The first of those is that Appellant Welles has a valid registered trademark for the word Edwell. Second, there's no dispute here and it was found by the lower court that the appellee Edwell's use of Edwell is nearly identical in both spelling and pronunciation to Appellant's registered mark. That's also the first factor that we'll get to in a little bit. There's also no dispute that Appellant Edwell's mark is a moderately strong mark as the lower court put it. And maybe more important, there's no dispute here that the proper test for analyzing likelihood of confusion here is the parameter set out in the beer nuts case in which the question was whether the use of the mark is likely to cause confusion in the marketplace concerning the source of the products or services at issue. And therein lies the key question here. Did the district court apply that test? It did not. If you look at the factors in the analysis that the district court undertook for the remaining factors, you find that he's repeatedly referring to distinctions between the services. He uses the word services 11 times in that analysis. He has repeated references to the substance and the parameters of what services are offered by the two parties. He never once talks about confusion as to the source. There is a terminology issue here, but if, how am I going to read, see there, Edwell single L, no, you're single L, so I'm still confused. Exactly. But my question is, they aren't your competitors, are they? I'm sorry, is your question, are they competitors? Yeah, they're really not competitors. You're in a different educational space than double L. So the primary space that we operate in, and this goes to the first factors of the similarities and differences between the product services and the marketing efforts. The question there is, what are the similarities? And while it's true we're not direct competitors, because our clients' current efforts are primarily focused on training in the project management fields, and they're primarily focused in educator wellness offerings. When you look at what's actually being offered, which is educational services, they both offer coaching. These are undisputed facts that were in the findings of fact and they're also in the appendix from the hearing on this matter. Both parties offer coaching services. For example, they advertise on their website that they have individualized one-on-one coaching available. For our client, every single client that comes through their project management training system has a coach assigned to it. They both offer training and seminars. So when you look at it in that respect... across the board of products, I mean, coaching, there's just all kinds of products. That's so generic, it doesn't, to me, carry much weight about similarity. I don't think it is generic when you consider it in light of the overall context of this case, because while it's true there's many companies that are offering coaching services, what's not true is they're not doing it in the same internet domain names. So our client has all of the Edwell domains, edwell.com with 1L and 2Ls, edwell.net with 1L and 2L, edwell.co with 1L and 2L. These were registered between 1998 and I believe 2005 or maybe 2003. They also have edwellwith1l.org. The only one they don't have is edwell.org with 2Ls. There's nothing improper, however, for under the Lanham Act with appropriating someone else's domain name. Now, that might be a violation of the cybersquatting law, but using another party's domain name is different than appropriating someone else's mark under the Lanham Act, isn't that right? I think there is a distinction when you're talking about cybersquatting on a domain name versus the Lanham Act itself. But the distinction here is they're actually using the domain name. So when you go to edwell.org, and now I'm talking about edwellwith2Ls.org, the defendant's web or the appellee's website, what you're finding is they're offering those same services. So now you have the same types of services, and again, it's somewhat generic in context, but it's, again, the totality of the circumstances here. It's coaching services. It's programming. It's training seminars. Those things are alike in both regards. The domain name the two parties are using is identical, but for 1L. Their markets are different, I think, aren't they? I mean, isn't it true that the plaintiff's market is management, generally, and defendant's market is specifically K-12 health? So you're really marketing to different groups of customers. I think I would say the defendant's market is the health of K-12 educators. I think they've recently started to shift a little bit into also student health, but I think their primary focus is on the health of the teachers themselves. Does the plaintiff, do they market to teachers? They have had, they market, they've been in business for 30 years using this mark. I mean, what they're doing, because you can abandon activities, anything, so let's not talk about what they did 30 years ago, but at the time of the litigation, were they doing any marketing to teachers? Any evidence of that in the record? What there is evidence of in the record is their email list is 65,000 people strong, and some of their customers, for their project management training, have been educators and teachers. I don't believe there's anything in the record where they are specifically going and identifying teachers and targeting them, if that's what you're questioning. We're here on a clear error standard of review, an uphill battle for you. What's the reversible error from the district court? So I think there's two aspects of it. First, I think whether or not the proper standard from the Biernutz test and its progeny was applied here is a matter of law. And if the wrong standard was applied by the fact finder, that's a matter of law, that's not a clear error standard. When it comes to the ultimate findings, I think that is a clear error standard. And we would argue that when you do apply the proper standard, which is the case for the Biernutz standard, it's also set forth pretty clearly in the Team Tires case from the circuit in 2005, I believe. When you apply that standard, we would argue there's no reasonable fact finder that could come to a different conclusion than the fact that Edwell, the appellee, is infringing upon the mark of the appellant. And so I think when you apply that correct standard, you can make the decision of infringement here. In fact, that's similar to what was found in the Biernutz case itself, where the only thing on remand after a finding by this court of infringement was just remand for remedy. Well, you know, it's a good point. I mean, they're virtually identical. So I think a consumer would have to do some research to figure out which company is which. And it seems like the Lanham Act cases seem to suggest that we tolerate some amount of confusion that can be corrected by a customer for different products. They can figure out their management, their K through 12 wellness. And, you know, here I read the district court's opinion to suggest that once you dig down a few inches, a few clicks on the internet, you're going to figure out there are different companies. And what's the flaw in that reasoning? I think his focus is slightly different. What he's repeatedly saying in his order is that if you dig down, you can figure this out during the due diligence process. He says that for one of the factors. For another, he says the chance is slim to none that someone sitting in a project management course would think they're in a course for educator wellness. Well, of course not, right? We all agree that by the time you get into the classroom, hopefully all of your students know what class they're in, right? That's not the test. The test is whether in the marketplace, is there a likelihood of confusion as to the source? If you look to the team tires case of this circuit, they go even further and clarify that it's not even limited to confusion of consumers as to the source of goods, but also includes confusion as to sponsorship or affiliation. That's 394F3D and 835. Is there anything in the record that would suggest an intent by single L to get into the wellness space or to offer, and maybe vice versa, whether double L might offer wellness training to corporations that are part of your space and market? I guess my suggestion is, or my question is, is there any indication to believe that these indirect competitors would become direct competitors anytime soon? This is one of the challenges of this case because we're dealing with one company that's been in business using the Edwell mark for over 30 years. We're dealing with the second as an organization that's been in business, I believe, a little less than two and a half years. They've made a lot of changes in those two and a half years. They've stated in the record that they are in growth mode and they're looking forward to continued growth. But today, or at least as of the time the record closed at the hearing, they only had about 300 customers. We have a little bit of a dilemma where as time evolves and we have a pending motion to supplement the record, which I don't think really changes the decision of the court here, but it's a good example of, it's ongoing, this confusion in the marketplace. And now our client has received emails that are set out in that motion saying... I didn't see any argument about your dilution of your mark. Is that not an issue that you... You're not worried that your competitor or the alleged infringer would somehow diminish the strength or reputation of your mark? I think there's two flavors of that. There's the actual cause of action for dilution of the mark, but there's also the harm that comes from the dilution of mark. And I think that is in fact front and center here because these are what we're seeing from the actual evidence. When you have someone reaching out on the record and telling the client, well, you look sketchy. I don't know what's going on here. Has your company done anything to strengthen the reputation of the mark? Any kind of advertising or other forms of branding? Our company? Yes. Absolutely. They've spent, I don't remember the exact figures in the record, but it's been hundreds of thousands of dollars spent over the years in marketing efforts. They send out hundreds of thousands of emails every year to an email list of 65,000 people that uses their mark. Every one of their classes and programs has materials that are branded with the Edwell mark. And so this is the cornerstone of Edwell's, or I should say, Emwell's business because they are doing business as Edwell. I believe I have a minute and a half left. You may reserve. Thank you. Good afternoon, your honors, and may it please the court. Matthew Freemuth for the Appellee Edwell, Inc. And with me is my colleague, Trevor Schrader. This is a case where the district court did exactly what the law requires in determining whether or not there was a likelihood of confusion as a result of Appellee's use of the word Edwell, two L's, to market its educator wellness programs to educators in K-12 schools. The court considered a six-factor test used by courts in this circuit to assess likelihood of confusion. It considered... Would you agree with me that because of the basically identical sounds and spellings of the mark that there... This isn't a legal term of art, but they're inherently confusing. You're not going to know A from B at first blush. If I did an internet search today and I typed in Edwell, single L, I'm going to get both companies pop up, right? And I'm going to have to do some additional research to figure out who's who. So I don't like the phrase inherently confusing because I think that sort of gets to the ultimate issue we're here on today. But I do agree, and frankly, the district court acknowledges that the marks are essentially, for purposes of its own analysis, identical. Nevertheless, for reasons I'll discuss, I think the court appropriately concluded in light of all six factors as a whole, which is frankly what's required of the district court, there was no likelihood of confusion established. You don't just count those six factors up and say four to two, the four wins. I mean, they're not necessarily all of equal weight. Do you agree with that point? I do agree with that point, Your Honor. The score in the district court here was in fact four to two. Nevertheless, the district court recognized that you have to consider the factors as a whole, which is what the district court did. After its full evaluation of each individual factor and whether the record evidence supported that particular factor, the district court looked for other cases where the marks were very similar, if not identical, but the service offerings were different. Or we had customers with a high degree of discernment about the products they were buying to find out if there were support in the Tenth Circuit for its ultimate conclusion that based on the factors and how the district court sized them up, there was in fact no likelihood of confusion. In Team Tire, I'd like you to distinguish that, but it talked about two different businesses in this tire repair and franchises. It mentioned two examples, Anchemima Batter, Anchemima Syrup, Yale Locks, Yale Flashlights. So you have businesses that aren't really direct competitors, but the courts in those cases and in Team Tire's concluded that they were confusingly similar. What's your take on Team Tire? Why can we avoid that? So I think Team Tire, the issue on Team Tire was number one, it was a summary judgment ruling where the district court concluded that because the plaintiff and the defendant were competitors as a matter of law, that essentially meant that there could be no trademark infringement. And the Team Tire's case, as I understand it, said that's not quite right because we tend to extend to goods that are maybe not identical, but related in the minds of the consumer in the sense that they came from a single producer. So that is the Pancake Batter and the Pancake Syrup case. That is the case of the lock and the flashlight that might be sold in aisle five of a hardware store. That is not the case of an organization that provides seminars in project management and product management and my client who provides wellness coaching to teachers in grades K through 12. What happens if you want to expand into a kind of a corporate wellness business? Wouldn't that infringe on what Single Well does? So if Edwell were to expand into project management training, things like that, that might be a different question, Your Honor. So even corporate wellness wouldn't be a problem? I would say corporate wellness would also be a problem given that our target is educators in the K through 12 space. I'm hypothesizing that you might want to expand the scope of the business. And I appreciate that. There's two things I want to say. Even if we were to expand into corporate space with wellness coaching, I still don't think that gets close to project management course offerings like those that are offered by the appellant. And second, there is record testimony from Ms. Fisher, who is the principal of Edwell, two L's, to the effect that they have no intention of expanding. Her focus has always been on educators and mental health and wellness, not corporates. So the record testimony is that there is no intent to sort of expand in the way that Your Honor hypothesizes. Mr. Hart, Representative, you know, they've spent what sounds like quite a bit of money to protect and expand the reputation of the brand. It'd be an asset on its books. You know, it's a corporate asset. And to some extent, you know, it's their property, right? They were there first. You're coming in. Second, isn't there a legitimate concern that you've somehow potentially diminished or tarnished their trademark because you've kind of entered into their domain and offer different products that, you know, may reduce the value of that asset? I don't think so, Your Honor, for two reasons. I mean, one reason primarily is that our service offering is something altogether different. And again, going back to this core question of does our use of Edwell 2Ls, you know, generate confusion in the mind of the consumer as to the source of our product versus their product? The answer to that is clearly no. And I think with that answer, the likelihood that we would diminish their trademark is none because we're just different. Couldn't a consumer infer that they were related businesses, a subsidiary of each? And just to kind of expand on that, you know, hypothetically, what if your company offered, like, as part of its wellness coaching, you know, kind of a marijuana relaxation piece, you know, something that would be more controversial to many, many consumers? And a consumer might look at your company and say, oh, they're offering marijuana coaching, and they're probably part of these guys. And, you know, to heck with them both. I think you've still got to get to the core question of whether or not a consumer encountering Edwell 2Ls in the marketplace would draw any association between Edwell 2Ls and the appellant. And, again, because of the different, the nature of the different offerings, they're just, you know, the analysis shows there would not be that confusion. And so the likelihood of tarnishment in the way you hypothesize, I think, is not there. And the record also, of course, doesn't suggest any basis that Edwell 2Ls would develop. And I already asked this question, you know, how much research do we tolerate? You know, a consumer is going to have to do a little something to figure out which companies are which. I mean, is that a factor at all in the confusion analysis? I don't think so, Your Honor. I mean, I think it's essentially one, if not two, clicks of the internet, right, would reveal the differences between the two organizations. And I think, you know, the court below discussed the internet issue to some extent, made findings of fact on it, and discussed it in terms of its analysis of the marketing issue. And, again, the record, the appendix in this appeal is replete with multiple copies of the internet web pages from each organization. Is part of that inquiry, however, the factor on the high degree of care? And the judge did find, and this goes a little bit to your earlier interchange with Judge Avell, if the judge predicated the finding of no likelihood of confusion, at least in part, on high degree of care, and if we conclude that there was no evidence presented one way or another to support that, aren't we in a position that we really don't know if the decision had been three to three instead of, as you intimated earlier, four to two? We don't know what the judge would have found had the judge not found that individuals would exercise a high degree of care in this situation. Well, I think that the, so let me try to answer that in two ways. I think there is record evidence that supports the finding of a high degree of care. What? It's the notion that the course offerings of each are basically, you know, commitments to engage in courses that require hours of time and study to participate in, in the case of coaching, we're talking about sort of six-hour sessions. So this is not walking into a gas station and picking a can of peanuts up and thinking you've got beer nuts when, in fact, you have brunettes. But there wasn't an affidavit that said that. I mean, there was a deposition testimony that said that. It might be a plausible, even attractive, appeal to logic, but I didn't see any evidence to that effect. Did I overlook that? I think the evidence to that effect is the testimony from the witnesses about the nature of the offerings, the various website pages that describe the classes, that describe the coaching sessions, all of those suggest, and I think demonstrate, that what we're talking about here is, again, something more committed, something more time consuming than selecting a can of peanuts, which lends itself to the conclusion that, actually, consumers here are those that do exercise care in selecting their courses. And I would say, again, even if the court were sort of unable to resolve that specific factor based on the record below, I think given the differences in the services that are offered, given the lack of evidence of a likelihood of confusion. Well, that's part of my question. If there are six factors, if we find that the judge had erroneously relied on one of the factors, we really don't know what the judge would have found. And the whole predicate for using the clear error standard is that we are going to credit the ultimate finding on each one of those six factors. If you lose on any one of those factors, I wonder why we don't need to reverse, because we don't know what the judge would have found had the mix been three to three. Well, I think the basic premise of your question, Your Honor, is right that the six-factor test is a sort of scorekeeping scorecard. And it's not. The case law says that the factors have to be considered in their totality. And in sort of considering the factors in their totality, the court below looked to the three Tenth Circuit cases that I identified. I think it is the hospital case. It is coherent. Hartsbring was the hospital case. Coherent. And another, and these are in the last pages of the district court's opinion, to basically say, look, these cases look something like this fact pattern. And they all find no likelihood of confusion. So I don't think you can say just taking that factor away that the district court would have come out differently. That's kind of contrary to the way we deal with sentencing, where we say, if there's a factor wrong, we don't know what the role of that was. You got to redo it. How could we know what the outcome would be if the court was wrong about one of those factors? Again, I think I would give the same answer in that in looking at the way the court assessed the totality of the circumstances, I think you could make judgments about how the court did that and which factors it found most persuasive. Here, while I do think the particular factor, the degree of care was an important one, certainly there were others that weighed on the court's decision making, including the differences of the product offering. And so I think you could conclude, rightfully, that he would have come out the same way. Thank you, counsel. Time's expired. There's a few minutes remaining for rebuttal. Thank you, your honors. Thank you. What I heard a lot of from opposing counsel were statements like, you've got to look to the nature of the offerings. You've got to look to the nature of the tarnishment. In other words, the substance of the thing, of the product, of the service. And that's simply not the test. And therein lies the problem. The Lanham Act and beer nuts and team tires are all focused on the fact that you've got to look to the likelihood of confusion as to the source. But the fact is that sales sometimes are not worded in terms of the source. The similarity of the marks, for example, there's nothing in the phrasing from our precedents in the articulation of that factor that incorporates the concept of the source. So it seems to me that a district judge is between a rock and a hard place. Well, I think the factors, the case law from this circuit, at least, is clear that the factors are there to inform the analysis. And the cornerstone of the analysis under beer nuts and its progeny whether or not there is likelihood of confusion as to the source. And unfortunately, we've lost sight of that here. I do think, though, that the nature of the product does inform the source. I mean, if you had two products with the same name, one sold cars and one sold recreational services for teenage athletes, you probably wouldn't think that there was a confusion there. Even though you would be informed by that by the subject of what they were advertising. There may not be, but it would be a far different inquiry if they were using the same domain name online. Thank you. Thank you, counsel. Counselor, excused. The case is submitted.